```
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
---------------------------------------------
UNITED STATES OF AMERICA


    -versus-                            10-CR-571

VON SCOTT LINDAHL,

              Defendant.
---------------------------------------------


           TRANSCRIPT OF JURY TRIAL EXCERPT*

held on WEDNESDAY, JUNE 1, 2011, at the James T. Foley

United States Courthouse, 445 Broadway, Albany, New York,

the HON. GARY L. SHARPE, United States District Court Judge,

Presiding.

*EXCERPT – JASON STOCKLAS TESTIMONY

APPEARANCES:


FOR THE GOVERNMENT:   UNITED STATES ATTORNEY'S OFFICE – NDNY

                      BY:  TINA E. SCIOCCHETTI, AUSA


FOR THE DEFENDANT:    VON SCOTT LINDAHL, PRO SE


ALSO PRESENT:         FEDERAL PUBLIC DEFENDER'S OFFICE – NDNY

                      BY: TIMOTHY AUSTIN, STANDBY COUNSEL
```

*BONNIE J. BUCKLEY, RPR, CRR*
*UNITED STATES COURT REPORTER – NDNY*

1                    (In open court at 9:55 AM.)

2                    MS. SCIOCCHETTI:  Your Honor, the Government

3    calls Special Agent Stocklas from the Bureau of Alcohol,

4    Tobacco, Firearms and Explosives.  He should be arriving

5    shortly.

6                    THE CLERK:  Come right down this way.

7                    Please raise your right hand.  Please state

8    your full name for record.

9                    THE WITNESS:  Jason Stocklas,

10   S-T-O-C-K-L-A-S.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           **JASON STOCKLAS,**

2  having been duly sworn by the Clerk of the Court, was

3  examined and testified as follows:

4           THE CLERK:  Please take a seat in the witness

5  stand.  Just ask that you please speak clearly into the

6  microphone and adjust the microphone to your level.

7           THE WITNESS:  Sure.

8  **DIRECT EXAMINATION**

9  **BY MS. SCIOCCHETTI:**

10      Q.   Good morning.

11      A.   Good morning.

12      Q.   Can you please introduce yourself to the ladies

13  and gentlemen on the jury and tell them where you work?

14      A.   Certainly. My name is Jason Stocklas.  I am a

15  special agent with the Bureau of Alcohol, Tobacco, Firearms

16  and Explosives, most commonly referred to as ATF.

17      Q.   How long have you been with ATF?

18      A.   Just under four years.  Four years next month.

19      Q.   What kind of work do you do there?

20      A.   I investigate various violations of federal

21  firearms laws, explosives laws, arsons explosive

22  investigations, various violent criminal activity like

23  gangs, violent drug dealing activity, things of that nature.

24      Q.   Special Agent Stocklas, have you worked in the

25  Northern District of New York your entire time with ATF?

1   A.   No.  I've also worked in the Western District of
2 New York.
3   Q.   How long have you been in the Northern District?
4   A.   Just under three years.
5   Q.   Is Queensbury, New York located in the Northern
6 District of New York?
7   A.   Yes, it is.
8   Q.   Tell us a little bit about your work before you
9 worked for ATF.  What did you do?
10   A.   Certainly.  Immediately before I was an ATF agent,
11 I was a police officer in the City of Troy, New York.  Prior
12 to that I worked professionally as an engineer for both the
13 United States Government and state government.
14   Q.   What sort of training have you received regarding
15 firearms?
16   A.   In addition to the basic training that every ATF
17 agent receives, I've received advanced training in the
18 identification of firearms, the origin of firearms, making
19 determinations as far as where they were manufactured,
20 certain manufacturers markings.  I've been to several
21 firearms and ammunition manufacturing facilities to gain
22 further understanding of how firearms are produced.
23   Q.   Can you give us an idea or give the Court an idea
24 of some of the locations you've been for training?
25   A.   Certainly.  I've been to the ATF Firearms

1   Technology Branch Headquarters in Martinsburg, West Virginia
2   where ATF maintains a collection of over ten thousand
3   firearms, various types and significance, so as to present a
4   well-rounded picture of firearms of all kinds and of all
5   origins.  I've been to the Sigarms Manufacturing Facility in
6   Exeter, New Hampshire.  I've been to Remington's Ammunitions
7   Plant in Lonoke, Arkansas.  I've been to the Lake City Army
8   Ammunition Plant in Independence, Missouri.  I've also been
9   to Starline and Speer, both located in Ozark, Missouri.
10       Q.   Did you do anything else to familiarize yourself
11  with firearms other than those training cites?
12       A.   Yes.  I've had an interest in firearms for over 20
13  years.  I do a lot of shooting.  I've studied them.  Every
14  week I average -- in addition to the time that I spend at
15  work associated with firearms, I probably spend about 20
16  years an hour reading various periodicals specifically
17  toward firearms, various electronic media, other printed
18  material to keep versed on the history of firearms, as well
19  as current trends and new technologies.
20       Q.   Can you explain to the jury what the term
21  "interstate nexus" means?
22       A.   Certainly.  We refer to the term "interstate
23  nexus" meaning that a firearm has -- a firearm or ammunition
24  has at some point in its life moved across either state or
25  international lines.

1    Q.   Have you received specialized training in
2  determining the interstate nexus of firearms?
3    A.   Yes, I have.
4    Q.   Can you explain what that is?
5    A.   Certainly.  There was, there was an advanced
6  school conducted at the Firearms Technology Branch
7  Headquarters in Martinsburg, West Virginia, where it
8  specifically addressed how to identify certain features on a
9  firearm, certain markings, not only ones placed by the
10 firearms manufacturers but cases by importers as well as
11 certain proof houses and what not to make a determination on
12 where a firearm was manufactured, whether or not it is a
13 firearm, when it was manufactured, things of that nature.
14   Q.   That firearm, does that include rifles and
15 shotguns?
16   A.   Yes, it does.
17   Q.   And approximately how many firearms have you
18 evaluated to determine whether there was an interstate nexus
19 with that firearm?
20   A.   Approximately a hundred.
21   Q.   And what agencies or entities have consulted you
22 to make that determination?
23   A.   The New York State Police, the FBI, the DEA, the
24 IRS Criminal Investigation Division, numerous state and
25 local agencies in this area, the Northern and Western

1  Districts of New York U.S. Attorney's Offices.

2      Q.  Have you ever testified in court as an expert

3  regarding the interstate nexus of firearms?

4      A.  I have.

5      Q.  How many times?

6      A.  Once.

7      Q.  Was this in the Northern District of New York?

8      A.  It was.

9      Q.  Do you recall which judge?

10      A.  Judge Mordue.

11          MS. SCIOCCHETTI:  Your Honor, at this time

12  the Government asks that the Court accept Special Agent

13  Stocklas as an expert in the field of the interstate nexus

14  of firearms.

15          THE COURT:  Are there objections?

16          MR. LINDAHL:  None.

17  BY MS. SCIOCCHETTI:

18      Q.  Can you explain --

19          THE COURT:  Who am I to overrule Judge

20  Mordue.  I certainly concur.

21          That's an inside joke, folks.  Don't worry

22  about it.

23  BY MS. SCIOCCHETTI:

24      Q.  Can you --

25          THE COURT:  Judge Mordue is the Chief Judge.

1  BY MS. SCIOCCHETTI:

2      Q.   Can you explain for the jury the steps you
3  typically take when you look at a firearm to determine
4  whether there is an interstate nexus?

5      A.   Certainly.  I will conduct a physical examination
6  of the firearm.  I will usually try and operate the firearm,
7  not necessarily fire it, but just to get an idea of the
8  workings to make sure that it is an actual firearm.  I will
9  observe markings like the serial number, the manufacturer
10 labels, proof markings, importer's markings, various -- like
11 the actual design of a firearm.  A lot can be determined
12 just by looking at a firearm if it fits into a certain
13 family.  Things of that nature.

14     Q.   Are there databases or periodicals that you also
15 consult?

16     A.   Yes.  In addition to standard publications like
17 Flayderman's Guide, the Blue Book of Gun Values, various
18 off-the-shelf publications that are widely used in the
19 industry, ATF being the agency that regulates the firearms
20 industry also has access to licensing records and variance
21 markings.  Because all firearms manufacturers in the United
22 States have to be licensed by ATF, we keep very thorough
23 records in reference to the manufacturing of the firearms.

24     Q.   Special Agent Stocklas, in connection with this
25 case, were you asked by Special Agent Neely to examine three

1  firearms to make an interstate nexus determination?
2      A.   Yes, I was.
3      Q.   From where you are sitting, can you see the three
4  firearms that are next to me on my left labeled Government's
5  Exhibit 1, 2 and 3?
6      A.   Yes, I can.
7      Q.   Are those the guns that you looked at?
8      A.   Yes, they are.
9      Q.   I'm going to start with Government's Exhibit
10 Number 1 and hand it up to you.  Can you tell the jury what
11 type of gun that is, including the make, model, and serial
12 number of the gun.
13     A.   This is a Rossi.  It is a 357 magnum caliber
14 rifle.  It is a Puma M92 model.  It was imported by LSI in
15 Reno, Nevada.
16     Q.   What's the serial number of that?
17     A.   The serial number is 357-464.
18     Q.   Is that a firearm?
19     A.   Yes, it is.
20     Q.   And what did you do regarding that to determine
21 where it was manufactured?
22     A.   Well, in addition to examining the markings that I
23 just demonstrated, I referenced the ATF licensing database
24 to determine where the -- where it was imported, what
25 company imported the firearm; was it, in fact, manufactured

*JASON STOCKLAS - DIRECT - MS. SCIOCCHETTI*

1  in Brazil as it says on the firearm or was this a marking
2  variance.  I also consulted the Blue Book of Gun Values.
3      Q.   Where did you determine that firearm was
4  manufactured?
5      A.   It was, in fact, manufactured in Brazil.
6      Q.   I'm going to exchange with you Government's
7  Exhibit Number 2, and ask you to similarly identify this
8  exhibit by make, model, and serial number please.
9      A.   Certainly.  This is a Jing An, that's J-I-N-G
10 space A-N, shotgun, 410 caliber.  And the serial number
11 9001371.  The model number is SPM-410.
12     Q.   What did you do to determine whether that firearm
13 had been manufactured outside the State of New York?
14     A.   I referenced the ATF database with regards to
15 marking variances to make sure that there weren't any
16 variances in place; in other words, to make sure that it was
17 actually manufactured as labeled; and also checked some -- I
18 believe it was the Blue Book, it was another one of the
19 common publications, Blue Book or Flayderman's, on
20 background information on shotgun.
21     Q.   Where was it manufactured?
22     A.   It was manufactured in China.
23     Q.   Is that a firearm?
24     A.   Yes, it is.
25     Q.   I'm now going to show you Government's Exhibit

*BONNIE J. BUCKLEY, RPR, CRR*
*UNITED STATES COURT REPORTER - NDNY*

1  Number 3 and ask you if you could similarly identify this
2  one by make, model, and serial number.
3       A.   Certainly.  This is a Glenfield Marlin Model 75,
4  22 caliber.  The serial number is 25335574.
5       Q.   What did you do to determine where that gun was
6  manufactured?
7       A.   Again, I contacted or consulted the ATF database
8  to make sure there were not any marking variances in play,
9  as well as the Blue Book of Gun Values.
10      Q.   Where -- did you determine where the gun was
11 manufactured?
12      A.   This was manufactured in Connecticut.
13      Q.   Special Agent Stocklas, as a result of examining
14 Government's Exhibits 1, 2, and 3, and performing the
15 investigative steps that you just mentioned, have you
16 reached an opinion with a reasonable degree of certainty as
17 to the existence of an interstate nexus concerning these
18 three firearms?
19      A.   Yes, I have.
20      Q.   What is your opinion?
21      A.   They all have affected interstate and/or foreign
22 commerce.
23           MS. SCIOCCHETTI:  I have no further
24 questions.
25           THE COURT:  Do you have any questions,

*BONNIE J. BUCKLEY, RPR, CRR*
*UNITED STATES COURT REPORTER - NDNY*

1   Mr. Lindahl?

2              MR. LINDAHL:  Yes, I do.

3   **CROSS-EXAMINATION**

4   **BY MR. LINDAHL:**

5       Q.   What was your name again?

6       A.   Agent Jason Stocklas.

7       Q.   Mind if I call you Jason?

8       A.   That's fine.

9       Q.   Do you have any proof or evidence that those guns
10  are my guns?

11      A.   I have not developed any evidence along those
12  lines.

13      Q.   Do you have any proof or evidence that I affected
14  commerce with those guns?

15      A.   Yes.

16      Q.   You have proof that I affected commerce with those
17  guns?

18      A.   I have proof that those guns have affected
19  interstate and foreign commerce, and regarding the reports
20  that I have read that were obtained by other law enforcement
21  personnel, I -- it is my understanding that they were
22  recovered in your possession.

23      Q.   It's your understanding.  So you don't have any
24  proof that those guns are mine?

25      A.   I have the word of other law enforcement

*JASON STOCKLAS - CROSS - MR. LINDAHL*

1  investigators.

2      Q.   Do you have any proof that I affected commerce
3  with those guns?

4           MS. SCIOCCHETTI:  Objection.

5           THE COURT:  The objection is sustained.
6  Whether you personally affected commerce is irrelevant.

7           MR. LINDAHL:  Okay.

8           THE COURT:  The question is whether or not
9  the firearms travelled or have an affect on commerce.  Not
10 whether you do.  Whether the guns do.

11 BY MR. LINDAHL:

12     Q.   Did -- all right.  Just one second.  (Pause.)

13          Do you know how I purportedly possessed those
14 guns?

15     A.   I do not know all the specifics.  I just know that
16 they were recovered in your possession.

17     Q.   The reports that you read, did the reports say
18 that I had physical possession of those guns?

19     A.   I don't recall.

20     Q.   You don't recall?  Did it say that I claimed that
21 they were my guns?

22     A.   I don't recall.

23     Q.   So you don't recall how I had possession or
24 purportedly had possession of these guns?

25     A.   That's correct.

*BONNIE J. BUCKLEY, RPR, CRR*
*UNITED STATES COURT REPORTER - NDNY*

1    Q.   Okay.  Do you know if any fingerprints were on
2  these guns?
3    A.   I don't know.
4    Q.   Can commerce be traced to the purchaser of the
5  guns?
6    A.   I don't know if I understand your question.
7    Q.   Can the commerce, being sold from another state
8  into this state, can that be followed to the purchaser of
9  those guns?
10   A.   If what you're referring to is a firearm trace, a
11 firearm trace can be initiated, and it will only determine
12 the first retail purchaser of the firearm.
13   Q.   It won't go to who purchased it from the retailer
14 unless possibly it went to another retailer?
15   A.   We only trace back to the first retail purchaser
16 of the firearm.
17   Q.   Okay.  So you can't say who purchased the firearm
18 afterwards?
19   A.   No.
20   Q.   The only nexus that you're saying is that it went
21 from another state to another state, correct?  Or from
22 another country to this country?
23   A.   That's correct.
24   Q.   That's correct?  No other questions.
25             THE COURT:  Anything further?

*BONNIE J. BUCKLEY, RPR, CRR*
*UNITED STATES COURT REPORTER – NDNY*

1      MS. SCIOCCHETTI: Nothing further, your
2 Honor.
3      THE COURT: You may step down. Thank you.
4      (Witness Jason Stocklas excused at 10:15 AM.)
5      * * * *
6
7           **C E R T I F I C A T I O N**
8
9      I, BONNIE J. BUCKLEY, RPR, CRR, Official Court
10 Reporter in and for the United States District Court,
11 Northern District of New York, do hereby certify that I
12 attended at the time and place set forth in the heading
13 hereof; that I did make a stenographic record of the
14 proceedings held in this matter and caused the same to be
15 transcribed; that the foregoing is a true and correct
16 transcript of the same and whole thereof.
17
18
19                              _____
20                              BONNIE J. BUCKLEY, RPR, CRR
21                              U.S. Court Reporter - NDNY
22
23 DATED: JUNE 3, 2011
24
25

*BONNIE J. BUCKLEY, RPR, CRR*
*UNITED STATES COURT REPORTER - NDNY*